NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2017-0035


CHERYL C. MOORE, M.D.

v.

CHARLES W. GRAU, ESQUIRE & a.

Argued: January 18, 2018
Opinion Issued: August 8, 2018

Devine, Millimet & Branch, P.A., of Manchester (Daniel E. Will and Joshua M. Wyatt on the brief, and Mr. Will orally), and Associated Attorneys of New England, of Manchester (John F. Skinner, III on the brief), for the plaintiff.

Bernstein, Shur, Sawyer & Nelson, P.A., of Manchester (Andru H. Volinsky and Christina A. Ferrari on the brief, and Mr. Volinsky orally), for the defendants.

Shaheen & Gordon, P.A., of Concord (William E. Christie on the memorandum of law), for the intervenor.

HICKS, J.  The plaintiff, Cheryl C. Moore, M.D., appeals an order of the Superior Court (McNamara, J.) granting summary judgment to the defendants, Charles W. Grau, Esquire and Upton Hatfield, LLP, on the plaintiff's claims for legal malpractice, violation of the New Hampshire Consumer Protection Act, RSA ch. 358-A (2009 & Supp. 2017), and entitlement to an accounting and forfeiture of fees.  We reverse and remand.

The following facts are taken from the trial court's orders in this case and from undisputed documentary evidence contained in the record.  The plaintiff, a pathologist, was a member of Young & Novis, P.A. (Y&N), along with her partner, Dr. Glenn Littell.  Y&N provided pathology services to the intervenor, Wentworth-Douglass Hospital (WDH), until WDH elected to terminate Y&N's services, effective February 28, 2010.  Prior to that date, an attorney acting on Y&N's behalf — Gregory Wirth — solicited trial counsel for a potential wrongful termination suit against WDH.  Grau, an attorney at Upton Hatfield, responded, and, on October 23, 2009, the plaintiff retained Grau and his firm.

Wirth continued to represent the plaintiff and Littell with respect to their exit from WDH.  In that capacity, Wirth emailed Grau to inquire what documents or information he might need for the anticipated lawsuit.  Grau responded with a list of documents and records he wanted the plaintiff and Littell to "take."  Wirth forwarded Grau's response to the plaintiff and Littell on February 10, 2010.

 On February 28, the termination date for Y&N's services, the plaintiff allegedly permitted her husband, Dr. Thomas Moore, to access Y&N computers connected to WDH's network.  The plaintiff's husband and Littell then downloaded confidential documents and destroyed certain electronic data.

WDH sued the plaintiff, her husband, and Littell (the CFAA defendants) in federal court (the CFAA litigation), claiming violations of the Computer Fraud and Abuse Act (the CFAA).  See 18 U.S.C. § 1030 (2012).  The CFAA defendants responded with a number of counterclaims against WDH.

In August 2012, the parties reached a tentative settlement.  During negotiations preceding the tentative settlement, the CFAA defendants were jointly represented by Grau and Upton Hatfield, along with Wirth.  In mid-August, however, the plaintiff hired a separate attorney, Peter Callaghan, to represent her in finalizing the settlement.

On September 20, 2012, the plaintiff executed a settlement agreement (the Settlement Agreement) to which WDH, Y&N, Littell, and the plaintiff's husband were also parties.  The Settlement Agreement resolved all claims and counterclaims in the pending litigation and contained the following provision regarding future suits (Paragraph 4):

2

All Parties represent that no future lawsuits will be filed against any third parties arising from the former relationship between WDH and the [CFAA defendants]. All Parties represent that they have fully disclosed to the other Parties any disclosures or complaints filed with any state, local or federal law enforcement or administrative agency, any accrediting organization, Board, professional organization or other entity of any kind that regulates, oversees, credentials, accredits or has enforcement authority over any party (collectively, "Agencies") and hereby represent that they have no basis to make any further such disclosures or complaints and shall not make such disclosures or complaints to any Agencies.

In Paragraph 3 of the Settlement Agreement, however, WDH specifically acknowledged that the agreement did not prohibit the CFAA defendants from continuing to pursue a pending lawsuit against their insurance company.

In March 2013, the plaintiff commenced the instant lawsuit against the defendants, alleging legal malpractice, violation of the Consumer Protection Act, and entitlement to an accounting and forfeiture of fees. WDH intervened in the action. The defendants moved for summary judgment on several grounds, including that the Settlement Agreement barred the suit. The trial court granted summary judgment on that basis, concluding that the plaintiff's claims against the defendants in the instant action "originate or grow out of or flow from her relationship with WDH," and, therefore, fall within the prohibition of Paragraph 4 of the Settlement Agreement. Having determined that the Settlement Agreement barred the suit, the court found it unnecessary to address the defendants' remaining arguments or to decide a pending motion to quash. The plaintiff unsuccessfully moved for reconsideration, and this appeal followed.

On appeal, the plaintiff argues, among other things, that the trial court erred in granting summary judgment to the defendants because the plaintiff's legal malpractice claims do not "arise from" her relationship with WDH and, therefore, do not fall within the terms of Paragraph 4. Our standard of review is well-settled:

In reviewing the trial court's grant of summary judgment, we consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the non-moving party. If our review of that evidence discloses no genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law, we will affirm the grant of summary

3

judgment. We review the trial court's application of the law to the facts de novo.

Pike v. Deutsche Bank Nat'l Trust Co., 168 N.H. 40, 42 (2015) (citations omitted).

"Generally, parties are free to settle a case on any terms they desire and that are allowed by law." Poland v. Twomey, 156 N.H. 412, 414-15 (2007). "Settlement agreements are contractual in nature and, therefore, are generally governed by principles of contract law." Id. at 414. "Interpretation of a contract, including whether a contract term or clause is ambiguous, is ultimately a question of law for this court to decide." Merrimack School Dist. v. Nat'l School Bus Serv., 140 N.H. 9, 11 (1995) (quotation and brackets omitted). "In interpreting a contract, we consider the contract as a whole," id., and "we give words their ordinary meaning unless it appears from the context that the parties intended a different meaning," id. at 13. "When parties use expansive, unrestricted language, we will give those phrases their normal, broad reading." Id.

"Generally speaking and subject to exception, a party is not released unless named in the release." Balamotis v. Hyland, 159 N.H. 803, 808 (2010) (quotation and brackets omitted). Even "a release . . . [that] purports to comprehend all claims arising from a particular incident, including claims against unspecified strangers, is not dispositive of the question whether the release bars later suit against a party not named in the release." Gagnon v. Lakes Region Gen'l Hosp., 123 N.H. 760, 764-65 (1983). Because the assertion that the Settlement Agreement bars this suit against the defendants is an affirmative defense, the defendants bear the burden "to show that the release was intended to discharge them or that the plaintiff has received full compensation." Id. at 765.

We note that Paragraph 4 reads as a covenant not to sue, rather than a release. See Stateline Steel Erectors v. Shields, 150 N.H. 332, 338 (2003) (discussing distinction between covenant not to sue and release). Nevertheless, we see no impediment to applying the foregoing cases to the provision at issue here, whether construed as a release, a covenant not to sue, or, as the defendants call it, a "waiver of claims." Indeed, while in the past, a release of one joint tortfeasor generally barred suit against the others, though presumably not named in the release, see Wheat v. Carter, 79 N.H. 150, 150 (1919); but cf. RSA 507:7-h (2010) (altering common law rule), such was never the case with covenants not to sue, see Colby v. Walker, 86 N.H. 568, 570 (1934), nor true as a matter of law as to successive tortfeasors, see Wheat, 79 N.H. at 152.

4

Paragraph 4 does not specifically name Grau or Upton Hatfield, but broadly purports to cover "future lawsuits . . . against any third parties arising from the former relationship between WDH and the [CFAA defendants]." In arguing that Paragraph 4 does not cover the instant action, the plaintiff first looks to the phrase "arising from." She asserts that "[w]hile it could be argued that [her] claims might have a remote 'relation to' the former pathology contract between WDH and Y&N, it cannot plausibly be argued that this action 'arises from' that former contractual relationship."

Although we have not construed the language "arising from" as used in a contract, cf. Merrimack School Dist., 140 N.H. at 13 (construing "arise from or out of"), we have construed the phrase "arising out of." See, e.g., Cannon v. Maine Bonding & Cas. Co., 138 N.H. 365, 366 (1994). As the trial court noted, and the defendants reiterate, our cases recognize that "[t]he phrase 'arising out of' has been interpreted as a very broad, general and comprehensive term, which we have defined as meaning 'originating from or growing out of or flowing from.'" Merrimack School Dist., 140 N.H. at 13 (quotation and brackets omitted). Courts in other jurisdictions, at least when construing the phrase in an insurance policy, have given the phrase "arising from" the same broad construction as "arising out of," see Spirtas Co. v. Federal Ins. Co., 521 F.3d 833, 836 (8th Cir. 2008) (noting that, "in the insurance context courts appear to be unanimous in interpreting the phrase 'arising out of' synonymously with the term 'arising from'"), and we will do likewise here.

The defendants contend that phrase is even broader than set forth above, arguing that "this Court and the First Circuit have defined 'arising from' as 'originating from, growing out of, flowing from, incident to or having connection with.'" (Emphasis added.) The quoted definition, however, is from a First Circuit case applying Maine law in the specific context of insurance policies. Penn-America Ins. Co. v. Lavigne, 617 F.3d 82, 87 (1st Cir. 2010) (noting that "[u]nder Maine law, as elsewhere, phrases such as 'arising out of,' when used in insurance contracts, do not connote a direct causal nexus"). We, however, have never interpreted the phrase so broadly, and the defendants have not persuaded us to do so in this case. As we have construed the phrase "arising out of," and now construe the phrase "arising from," for X to "arise out of" or "arise from" Y requires some causal connection between X and Y. "While the causal connection need not be 'proximate' as that term is used in the more demanding evidentiary area of tort law, the causal connection must still exist." Pro Con Constr. v. Acadia Ins. Co., 147 N.H. 470, 472 (2002). "[T]he causal connection between the two must be more than 'tenuous,'" Cannon, 138 N.H. at 366, and must consist of more than mere "but for" causation, Pro Con Constr., 147 N.H. at 473.

The "Y" in Paragraph 4 is "the former relationship between WDH and the [CFAA defendants]." The plaintiff asserts that the instant suit arises not from

5

that relationship, but rather, from the relationship between herself and the instant defendants.  We agree.

In New Hampshire, legal malpractice is a tort essentially sounding in negligence.  See Witte v. Desmarais, 136 N.H. 178, 182 (1992).  As such, it requires proof of "facts upon which the law imposes a duty of care."  Id. (quotation omitted).  The duty of care in legal malpractice is one imposed by law, and arises out of the attorney-client relationship itself.  See id.; Miller v. Mooney, 725 N.E.2d 545, 549 (Mass. 2000) ("The duty of care owed by an attorney arises from an attorney-client relationship.").  Thus, "[t]o establish legal malpractice a plaintiff must prove: (1) that an attorney-client relationship existed, which placed a duty upon the attorney to exercise reasonable professional care, skill and knowledge in providing legal services to that client; (2) a breach of that duty; and (3) resultant harm legally caused by that breach." Yager v. Clauson, 166 N.H. 570, 572-73 (2014) (quotation omitted).

As the foregoing implies, an action for legal malpractice "is a claim . . . for liability 'unique to and arising out of the rendition of professional services.'" Virsen v. Rosso, Beutel, Johnson, Rosso, 356 N.W.2d 333, 335 (Minn. Ct. App. 1984) (quoting R. Mallen and V. Levit, Legal Malpractice § 1, at 3 (2d ed. 1981)).  Accordingly, courts have recognized that "the injuries suffered by a plaintiff in a legal malpractice suit are separate and distinct from those suffered in the underlying suit," Parnell v. Ivy, 158 S.W.3d 924, 927 (Tenn. Ct. App. 2004), and that a "plaintiff's malpractice action is an independent cause of action, not subsumed in the plaintiff's personal injury action," Cook v. Connolly, 366 N.W.2d 287, 291 (Minn. 1985); see also King v. Jones, 483 P.2d 815, 818 (Or. 1971) (concluding that "[p]laintiff's claim against [a tortfeasor] for personal injuries and her claim against [her lawyers] for malpractice are separate and distinct claims").  It follows, as courts have also concluded, that the attorney is not a joint tortfeasor with the defendants in the underlying action.  See, e.g., King, 483 P.2d at 817.  Rather, the attorney is a successive or independent tortfeasor.  Cf. Gagnon, 123 N.H. at 763 (noting that medical malpractice defendants were not joint tortfeasors with settling defendant in personal injury suit, but rather, were "successive or independent wrongdoers who are not liable for the same loss as the driver because their liability arises solely from their alleged negligent conduct which aggravated the plaintiff's existing injury").

In light of these distinctions, numerous courts have concluded, on various grounds, that settlement of the underlying action does not, as a matter of law, bar suit against an attorney for malpractice during that underlying action.  See, e.g., King, 483 P.3d at 817 (concluding that settlement of underlying action does not bar a malpractice action against attorney "on the basis that a release of one joint tort-feasor releases all," because the attorney is not a joint tortfeasor with wrongdoer in underlying action); Parnell, 158 S.W.3d

6

at 925 (holding that because damages sought in plaintiff's malpractice action were "separate and distinct" from those sought in underlying action, "settlement of the underlying lawsuit does not shield the former attorneys from [malpractice] liability"); see also Becker v. Julien, Blitz & Schlesinger, P. C., 406 N.Y.S.2d 412, 414 (Sup. Ct. 1977) (concluding that "the cause of action for legal malpractice must stand or fall on its own merits, with no automatic waiver of a plaintiff's right to sue for malpractice merely because plaintiff had voluntarily agreed to enter into a stipulation of settlement" in the underlying action), aff'd as modified on other grounds, 411 N.Y.S.2d 17 (App. Div. 1978).

While the issue before us is not whether settlement with WDH bars the instant action as a matter of law, but whether this action falls within the terms of Paragraph 4 of the Settlement Agreement, we believe that the legal principles upon which the foregoing cases rest are dispositive. The issue before us is analogous to that presented in Lujan v. Healthsouth Rehabilitation Corp., 902 P.2d 1025 (N.M. 1995). There, Irene Lujan's son was injured in a collision between motor vehicles on January 27, 1990. Lujan, 902 P.2d at 1026. In settling the personal injury action against the other motorist, Lujan signed a release "discharg[ing] 'any and all other persons . . . who together with [the other motorist] may be jointly or severally liable to [Lujan] . . . from any and all claims . . . and demands of whatsoever kind or nature . . . for damages to [Lujan's] person or property arising out of an accident on or about January 27, 1990.'" Id. at 1031. Lujan later sued Healthsouth Rehabilitation Corporation and others (collectively, Healthsouth) "for medical malpractice in connection with treatment of the femoral fracture that [her son] suffered in the accident with" the other motorist. Id. at 1026. Healthsouth successfully moved for summary judgment, arguing that the action was barred by the release given in settling the underlying action, and the Court of Appeals affirmed. Id.

The Supreme Court of New Mexico reversed, "conclud[ing] that the general release executed by Lujan does not purport to bar her claims against a successive tortfeasor whose liability is limited to an injury enhancement arising out of the subsequent malpractice." Id. The court noted that the issue before it was "whether Healthsouth falls within the category of 'other person' who together with [the other motorist] may be 'jointly or severally liable' to Lujan for injuries arising out of the January 1990 accident." Id. at 1027. The court reasoned:

> It is . . . true that "but for" the accident, [Lujan's son] would not have been subject to Healthsouth's treatment. Nevertheless, factually, [the son's] separate enhanced injury was caused by the alleged negligence of Healthsouth in March 1990 . . . . Thus from the perspective of Healthsouth, the would be "other person," its liability for the enhanced injury suffered by [the son] arises solely from its alleged negligence and not the January 1990 accident.

7

Id. at 1031. The court ultimately concluded that "the language 'arising from the January 27, 1990, automobile accident' is . . . simply insufficient to alert Lujan that [the other motorist] was bargaining for the release of Healthsouth in addition to her own release." Id. at 1032. Accordingly, it held that "Healthsouth does not fall within the category of 'other person' liable for injuries arising out of the January 1990 . . . accident." Id.

We similarly construe the Settlement Agreement here. As noted above, legal malpractice — a separate and distinct claim against an independent and successive tortfeasor, see, e.g., King, 483 P.2d at 817-18 — arises out of the attorney-client relationship. See Witte, 136 N.H. at 182; Miller, 725 N.E.2d at 549. The malpractice alleged here cannot be said to bear any causal connection to the former relationship between WDH and the CFAA defendants other than the fact that "but for" that relationship, Y&N's services could not have been terminated, there would have been no CFAA action, and the plaintiff "would not have been subject to" the malpractice allegedly committed by the defendants with respect to those matters. Lujan, 902 P.2d at 1031. Indeed, the defendants themselves assert only a "but for" nexus, arguing that "[a]bsent the relationship with WDH, [the plaintiff] would not have sought [the defendants'] legal representation." As noted above, however, the phrase "arising from" requires some causal connection greater than mere "but for" causation. Pro Con Constr., Inc., 147 N.H. at 472-73. Like the court in Lujan, we conclude that the language at issue here is "simply insufficient to alert [the plaintiff] that [WDH] was bargaining for the release of [the malpractice defendants] in addition to [its] own release." Lujan, 902 P.2d at 1032.

The defendants, nevertheless, raise a number of counterarguments. First they assert that the plaintiff's brief fails to address two facts that the trial court found to be undisputed: (1) she had independent counsel prior to executing the Settlement Agreement; and (2) she acknowledged, in Paragraph 14 of the agreement, that she executed it "knowingly, voluntarily and without undue influence or duress." Neither of these facts, however, undermines the conclusion we reached above. The plaintiff is neither challenging the validity of the Settlement Agreement, "collateral[ly] attempt[ing] to go behind the previous settlement," Becker, 406 N.Y.2d at 413, nor seeking to undo it, see id.; Virsen, 356 N.W.2d at 335 (noting that "the present legal malpractice action is not an action to vacate, revive or set aside the settlement with" the tortfeasor in the underlying litigation). Rather, she argues that the Settlement Agreement does not bar the instant litigation. Thus, this argument does not persuade us to alter our decision.

The defendants next assert that the plaintiff erroneously "attempts to create a dispute between the meaning of 'arising from' and 'arising out of' as if the terms are specific terms of art in contractual construction to be understood completely divorced from the factual context in which the terms are used." The

8

defendants contend that "[t]he undisputed factual context surrounding . . . execution of the Settlement Agreement" substantiates the trial court's finding that the plaintiff's claims "arise from" her former relationship with WDH. (Bolding omitted.)  Specifically, they assert that both the plaintiff and WDH intended the Settlement Agreement to effect a "complete, permanent divorce from each other" after "bitter and long-standing" litigation.  "To that end," the defendants argue, "in the Settlement Agreement, [the plaintiff] specifically disclaimed interest in bringing, and relinquished her ability to bring, other lawsuits that could embroil WDH."

> When interpreting a written agreement, we give the language used by the parties its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole.  Absent ambiguity, the parties' intent will be determined from the plain meaning of the language used in the contract.  We judge the intent of the parties by objective criteria rather than the unmanifested states of mind of the parties.

State v. Collyns, 166 N.H. 514, 519 (2014) (quotations and citations omitted).

Construing the Settlement Agreement as a whole in the context of the "bitter and long-standing" litigation between WDH and the CFAA defendants, we do not doubt that the parties sought a "complete, permanent divorce from each other."  (Emphasis added.)  That intent is manifest in the agreement's following recital:

> WHEREAS, the Parties mutually desire to compromise, settle, buy complete peace from, and terminate any and all known and unknown disputes, claims, controversies, demands, actions, causes of action, and litigation as exist between them including any damages, costs, expenses, and/or injuries in order to avoid the nuisance, time, and expense of further litigation . . . .

(Emphases added.)  The defendants do not contend that they are parties to the Settlement Agreement and, in fact, in arguing that they are "third parties" for purposes of Paragraph 4, they specifically assert that they "cannot be deemed a party to the Settlement Agreement."  Nor, contrary to the defendants' argument, did the plaintiff "relinquish[] her ability to bring[] other lawsuits that could embroil WDH."  Rather, she relinquished her ability to bring other lawsuits "arising from the former relationship between WDH and the [CFAA defendants]," which, as we concluded above, the instant lawsuit is not.  To the extent that WDH may have desired also to protect itself from becoming "embroil[ed]" in litigation between the plaintiff and the instant defendants, that

9

"unmanifested state[] of mind," id., has no bearing upon our interpretation of the contract's unambiguous language.

For its part, WDH argues that if the plaintiff is permitted to maintain this lawsuit, WDH "will lose the entire benefit of its bargain in entering into the Settlement Agreement," which was to "end all litigation involving WDH on the one hand, and [the CFAA defendants] on the other, regardless of whether the signatories to the Settlement Agreement were named parties to existing or future litigation." WDH seeks support in Watkins v. Bailey, 484 F. App'x 18, 19 (6th Cir. 2012), which held that a legal malpractice case based upon former counsel's conduct in an underlying medical malpractice case was barred by judicial estoppel. In addition to the factors of clear inconsistency between a party's earlier and later positions, judicial acceptance, and unfair advantage, Watkins, 484 F. App'x at 20, the court addressed "several additional considerations" in determining whether to apply judicial estoppel, id. at 24 (quotation omitted). WDH relies upon one of the additional considerations examined by the Watkins court: "There is the hospital to think about: it entered into a confidential settlement agreement. If the current lawsuit proceeds to trial, the hospital essentially loses the benefit of that bargain, namely to avoid litigation." Id.

The issue before us, however, is not application of judicial estoppel but contract interpretation, and, therefore, Watkins is inapposite. We know of no legal principle that would permit us to allow "additional considerations," id. (quotation omitted), to alter the plain language of an unambiguous contract provision. If WDH wanted to indemnify itself from costs associated with future actions of the CFAA defendants which might involve WDH or its employees as witnesses or otherwise, it could have drafted contract language to that effect. The language of Paragraph 4 does not express such an intent and we will not rewrite the parties' contract to do so. "Parties generally are bound by the terms of an agreement freely and openly entered into, and courts cannot make better agreements than the parties themselves have entered into or rewrite contracts merely because they might operate harshly or inequitably." Appeal of Silverstein, 163 N.H. 192, 202 (2012) (quotation omitted).

The defendants further argue "the fact that permission to pursue [a] declaratory judgment action [against an insurer] was specifically negotiated by the parties to the Settlement Agreement, and that no other exceptions to [P]aragraph 4's language were negotiated," supports the trial court's decision. The specific provision to which the defendants refer is Paragraph 3 of the Settlement Agreement, which provides:

> Pending Declaratory Judgment Action. WDH acknowledges that [the CFAA defendants] are engaged in litigation in the case of Young & Novis Professional Association v. The Travelers Indemnity

Company and Charter Oak Fire Insurance [Company], 2011-0418, currently pending before the New Hampshire Supreme Court and agrees that this Agreement does not limit [the CFAA defendants'] right to pursue such action.

The defendants contend that "[t]his pending declaratory judgment action arose from [the plaintiff's] relationship with her insurance carrier and under [her] current interpretation, it would not need to have been disclosed to or approved by WDH in the Settlement Agreement as an exception to [P]aragraph 4." Accordingly, the defendants assert, the inclusion of Paragraph 3 in the Settlement Agreement undermines the plaintiff's interpretation of Paragraph 4.

The plaintiff disagrees, arguing that the defendants' "assertion misleadingly conflates the separate provisions of the WDH Settlement Agreement addressing pending and future lawsuits." We agree. Because Paragraph 4 is, by its terms, a covenant not to bring future lawsuits, we reject the defendant's characterization of Paragraph 3 as a negotiated "exception" or "carve-out" to Paragraph 4. A pending action would not fall under Paragraph 4, and, therefore, would not need to be excepted from it. Conversely, to the extent that the dispositions of pending cases are provided for in separate paragraphs of the Settlement Agreement, the failure to include a provision for the instant litigation is, as the plaintiff argues, of no "interpretive significance . . . because this action was not pending."

WDH contends that other provisions of the Settlement Agreement — requiring dismissal of the CFAA litigation, acknowledging the settlement of a lawsuit by the CFAA defendants against a former WDH employee, and reserving WDH's "right to respond to a then pending Office of Civil Rights Investigation initiated by [the plaintiff]" — further demonstrate, in conjunction with Paragraphs 3 and 4, the parties' intent to "end all litigation," and "prohibit[] any future lawsuits[,] with one caveat," namely, the pending declaratory judgment action. While we agree that the Settlement Agreement, read as a whole, evinces the intent to systematically and comprehensively address both pending and future litigation, we disagree that it evinces the intent to end all pending and future litigation. In successive paragraphs, the agreement: (1) requires that one pending suit (the CFAA litigation) be dismissed; (2) acknowledges that another suit has already settled; (3) agrees that another pending suit may be maintained; (4) represents that certain future suits will not be brought; and (5) reserves WDH's right to participate in a pending administrative investigation. We conclude that the Settlement Agreement addresses each proceeding, or class of proceedings, separately, and, rather than evincing a blanket prohibition, carefully spells out whether and in what manner the parties may engage in each proceeding. Accordingly, we do not find WDH's argument persuasive.

11

The defendants next argue that the trial court's finding that the present case "'arises out of' the former relationship between WDH and the [CFAA] defendants is evidenced by the fact that to meet her burden of proof in the present case, the Plaintiff must try a 'case within the case.'" As the defendants correctly note, "[t]o establish proximate causation in a legal malpractice case, a plaintiff must demonstrate what result should have occurred if the lawyer had not been negligent." Yager v. Clauson, 169 N.H. 1, 5 (2016) (quotation omitted). This requirement, however, does not affect our conclusion above.

We have determined, after examining the nature of the instant action, that it does not fit within the terms of Paragraph 4. The manner in which the plaintiff must prove her case does not alter the nature of the action itself, and therefore, the defendant's argument does not persuade us. As noted in Virsen:

> Although the underlying claim upon which the legal malpractice action is based must be examined to ascertain whether the respondent-attorney did indeed breach an alleged duty to his client, the prayer for relief in this action is against the attorney and not against the settlement itself or the parties thereto.

Virsen, 356 N.W.2d at 335; see also Parnell, 158 S.W.3d at 928 (noting that "[a]lthough [the plaintiff's] damages in the malpractice lawsuit are measured with reference to the underlying claim, her malpractice claim is separate and distinct").

"Having determined that [Paragraph 4 of the Settlement Agreement] does not, by its terms, cover [the instant action against] the defendant[s] . . . we conclude that it does not support the trial court's grant of summary judgment." Balamotis, 159 N.H. at 811. Moreover, in light of our holdings herein, we find it unnecessary to address the parties' other arguments.

Reversed and remanded.

HANTZ MARCONI, J., concurred; KISSINGER, J., superior court justice, specially assigned under RSA 490:3, concurred.

12